UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**GEORGE MANSOUR, M.D.**; and
**GEORGE MANSOUR, M.D., P.A.**,

    Plaintiffs,

v.   Case No. 8:22-cv-595-WFJ-AEP

**FREEDOM HEALTH, INC.**; and
**PHYSICIAN PARTNERS, LLC**,

    Defendants.
_____/

# ORDER

Before the Court are Physician Partners, LLC ("PPC") and Freedom Health, Inc.'s ("Freedom") (collectively, "Defendants") motions to dismiss (Dkt. 36; Dkt. 37). George Mansour, M.D. ("Dr. Mansour") and George Mansour, M.D., P.A. ("Mansour, P.A.") (collectively, "Plaintiffs") have responded in opposition (Dkt. 70; Dkt. 73). Defendants have replied (Dkt. 81; Dkt. 82). Upon careful consideration, the Court denies both motions.

## BACKGROUND

The instant case arises from a failed quasi-employment relationship between Plaintiffs and Defendants. Plaintiffs allege that, while Dr. Mansour was working as a physician for PPC, Defendants conspired to artificially increase the risk-adjustment scores of Freedom's Medicare Advantage enrollees. Plaintiffs further

claim that, upon learning of Dr. Mansour's refusal to "play ball," Defendants orchestrated a scheme to retaliate against him while retaining his patients.

## I.     The Medicare Advantage Program and Defendants

The Medicare Advantage program allows Medicare beneficiaries to enroll in healthcare plans managed by private insurance companies which contract with the Centers for Medicare and Medicaid Services ("CMS"). CMS pays these insurance companies, commonly referred to as Medicare Advantage Organizations ("MAOs"), prospective lump sums each month based on MAO reporting of enrollee demographic and health information. As an MAO, Freedom is therefore not paid directly for the services that it provides to its enrollees. It is paid for the projected cost of providing said services, which is itself calculated through risk-adjustment.

Since at least 2017, Freedom has provided insurance benefits to a number of its enrollees by contracting with PPC (an independent physician association or "IPA"). Dkt. 37 at 3. Under their Group Participation Agreement (the "GPA"), PPC generally "employs and contracts with physicians and coordinates care between physicians, patients, and payors to provide healthcare services to [patients in Freedom's network]." Dkt. 36 at 4. Plaintiffs allege that PPC does so in exchange for "a portion of the per-enrollee payment" that Freedom receives from CMS. Dkt. 23 at 13. Plaintiffs consequently suggest that Defendants are similarly incentivized to ensure that Freedom's enrollees are given high risk-adjustment scores.

2

## II.     Plaintiffs' Relationship with Defendants

On February 6, 2017, Mansour, P.A. entered into a Physician Affiliate Agreement with PPC (the "Agreement"). Dkt. 23-1 at 1. The Agreement essentially provided that, through Mansour, P.A., Dr. Mansour would provide primary care to Freedom enrollees. *Id.* Mansour, P.A. also agreed "to abide and be bound by all of the terms, conditions, policies and procedures contained in the applicable Plan / IPA Agreement." *Id.* It is not entirely clear whether the applicable "IPA Agreement" was merely the GPA or some other contract between Freedom and PPC. But, either way, the Agreement made Plaintiffs contractors to PPC and subcontractors to Freedom.

On July 1, 2017, the parties' contractual relationship changed when Plaintiffs, Freedom, and PPC entered into an addendum to the GPA (the "Addendum"). Dkt. 23-2 at 1. The Addendum set forth terms under which Plaintiffs could render services to Freedom's enrollees, established that the Addendum would control "[i]n the event of any conflict" between it and the Agreement, and provided non-compete limitations. *Id.* The Addendum also contained the following termination provision:

> upon termination of the [GPA] for any reason, [Freedom] and [Plaintiffs] may enter into a separate contract for to [sic] provide Covered Services to Members, notwithstanding any non-compete clause of any contract between [PPC] and [Plaintiffs]. In its sole and absolute discretion, [Freedom] may terminate this [Addendum] with [Plaintiffs] and prevent [Plaintiffs] from providing Covered Services to Members, while continuing the [GPA] with [PPC].

*Id.* at 2.

### III. Defendants' Alleged Risk-Adjustment Score Inflation Schemes

Plaintiff's complaint focuses on three schemes that were allegedly aimed at artificially inflating the risk-adjustment scores of Freedom's enrollees, as well as Dr. Mansour's purported attempts to stop resulting False Claim Act ("FCA") violations.

The first alleged scheme revolved around PPC's "5 Star Checklist" or "5 Star Form." Dkt. 23 at 18. This "steering tool," as Plaintiffs characterize it, is a document that supposedly contains the past medical diagnoses of a subject patient. *Id.* at 19. It instructs physicians to "EVALUATE, ASSESS, AND TREAT" the included diagnoses while also stating as a disclaimer that "[t]his 5 Star checklist is not intended to be part of the patient's medical records. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress notes." *Id.*

Plaintiffs claim that, throughout 2017 and 2018, PPC "repeatedly provided Dr. Mansour with 5 Star Forms that contained false diagnoses for patients." *Id.* at 20. Sometimes, Plaintiffs allege, "the forms contained historical diagnoses that could not be found in any of the patient's previous records or medical files and which the patients themselves denied." *Id.* Still other times, "the 5 Star Forms contained false present diagnoses[.]" *Id.* Plaintiffs aver that these instances—and PPC coder Yogesh Patel's routine suggestions to revise Dr. Mansour's clinical notes—were attempts to push Dr. Mansour into "upcoding" patients "to more complicated and profitable

4

diagnoses." *Id.* at 20–22. Plaintiffs nevertheless maintain that Dr. Mansour "made repeated efforts to persuade [PPC] to correct false historical diagnoses" and otherwise "refused to accept the false diagnoses suggested by [PPC]." *Id.* at 21–25.

The second alleged scheme revolved around the Physician Office Diagnostic Service ("PODS") program. *Id.* at 25. Thereunder, PPC selected twenty-one of Dr. Mansour's patients for free ultrasound exams subject to two agreements between PPC and Dr. Mansour. The first agreement, the "[PODS] Program Request and Authorization Form," specified that PPC would arrange for an outside vendor to perform certain diagnostic exams if Dr. Mansour agreed to "arrange a follow-up visit for all tested patients within 2–4 weeks after their diagnostic test . . . to discuss their results and to document any related conditions appropriately per CMS documentation guidelines in their progress note." Dkt. 23-3 at 1. The second agreement, the "[PODS] Program Incentive Opportunity," provided that "PPC will provide $20 for each abnormal Progress Note faxed or emailed within 30 days of the testing date to the [primary care provider]." Dkt. 23-4 at 1.

Pursuant to the PODS program, twenty-one of Dr. Mansour's patents received ultrasound testing in April 2018. Dkt. 23 at 28. The results, however, made Dr. Mansour suspicious. *Id.* For "100% of the patients on whom an ultrasound was performed," PPC's selected radiologists "made peripheral vascular findings." *Id.* at 29. And, for 66% "of the patients selected by [PPC] for [echocardiograms]," PPC's

5

radiologist made cardiovascular findings" including "pulmonary hypertension, diastolic congestive heart failure, and systolic congestive heart failure." *Id.* at 29–30. Dr. Mansour subsequently informed PPC's representative, Greg Roy, that his patients should be referred to specialists for a second opinion. But Mr. Roy allegedly rejected Dr. Mansour's suggestions and told him to schedule appointments with the patients to "document the diagnoses." *Id.* at 30. Upon doing so, Dr. Mansour concluded that "the majority of the diagnoses suggested by the [PODS] reports were incorrect and should not be documented." *Id.*

Plaintiffs contend that Dr. Mansour argued repeatedly with various PPC representatives concerning the PODS diagnoses, but that PPC continued to urge him to document the findings. *Id.* at 31. When he refused, Plaintiffs claim that "Mr. Roy informed [Dr. Mansour] that he had talked to his superiors at [PPC] and that [Dr. Mansour] was contractually obligated to meet with patients and 'document' the diagnoses" or "he would be in violation of the PODS program contract." *Id.* Dr. Mansour "reluctantly succumbed" to the pressure but inserted various qualifiers in the diagnoses in order to "eliminate or lessen the chance that CMS would risk-adjust based [thereon]." *Id.* at 32.

The final alleged scheme involved a screening medivan that PPC arranged to operate in the parking lot outside of Dr. Mansour's office. *Id.* at 33–34. In this instance, Plaintiffs claim that, without Dr. Mansour's knowledge, PPC "mailed a

6

notice to approximately 200 of Dr. Mansour's Freedom patients stating that Dr. Mansour had recommended they receive preventative screening and instructed them to show up . . . on various dates." *Id.* at 34. Upon reviewing the resulting reports, Dr. Mansour found that approximately 50% of the patients who came were diagnosed with some form of cardiovascular disease. *Id.* at 35. Dr. Mansour refused to follow up with these patients concerning the medivan program tests or document their diagnoses. He claims that PPC "conducted the tests solely to produce additional, fraudulent diagnoses that could be used to increase [risk-adjustment] scores and capitation revenues." *Id.* at 34. He further claims that, "[b]y refusing to meet with the patients and explaining to Mr. Roy that he was declining because he knew the diagnoses were false, Dr. Mansour made efforts to stop [PPC] from committing violations of the FCA." *Id.* at 36.

## IV. Defendants' Alleged Retaliation

Plaintiffs claim that Defendants eventually became fully aware of Dr. Mansour's ongoing efforts to stop Defendants' FCA violations and his failure to otherwise cooperate. *Id.* at 36–37. Beyond refusing to accept PPC's "predetermined patient diagnoses on the 5 Star Forms" and "correct[ing] false historical information on those forms[,]" Dr. Mansour had repeatedly gotten into arguments with Mr. Patel and Mr. Roy. *Id.* Allegedly, Mr. Roy had even spoken to his "superiors" about Dr. Mansour's refusal to document purportedly false diagnoses from the PODS

7

program. *Id.* at 31. Plaintiffs further suggest that Defendants are (or were) more closely aligned than they admit. Plaintiffs point to the fact that PPC's owner, Siddhartha Pagidipati, was the Chief Operating Officer ("COO") of Freedom from 2007 to 2017. *Id.* at 6. Plaintiffs claim that Defendants regularly "collaborated with Freedom to maximize the revenue of both companies, including schemes to maximize the [risk-adjustment] scores of individual patients and to exert pressure on problematic physicians[.]" *Id.* at 38.

Upon learning of Plaintiffs' resistance, Defendants allegedly formulated a plan to retaliate in a way that would allow them to retain Dr. Mansour's patients. First, from January 1 to March 28, 2019, PPC "went 'radio silent.'" *Id.* at 39. Mr. Patel stopped making weekly contacts concerning Dr. Mansour's clinical notes, Mr. Roy stopped coming to Dr. Mansour's office to collect 5 Star Forms, and PPC stopped pressuring Dr. Mansour to meet with medivan patients while also ceasing all communications about patients with low risk-adjustment scores. *Id.* at 39–40. During this time, Dr. Mansour "naively believed" that PPC "resolved to leave him alone to treat his patients as he determined was medically appropriate." *Id.* at 40. In retrospect, he claims that this lack of communication—and Mr. Roy's unusual photocopying of patient files during the subject period—were aimed at "clearing the way for a calculated misappropriation of Dr. Mansour's Patents." *Id.*

Second, on March 28, 2019, PPC terminated the Agreement, effective May 31, 2019. Dkt. 23-5 at 1. Plaintiffs contend that this timing "meant that Dr. Mansour's patients would have only three days . . . to switch to a new Medicare Advantage plan if they wished to keep [him] as their primary care provider." Dkt. 23 at 41. In effect, his patients would have no meaningful opportunity to make changes before the open enrollment period expired, and Freedom would retain them unless Dr. Mansour could transfer to another Freedom network provider. *Id.*

Finally, around April 2019, Freedom representative Nancy Gareau refused Dr. Mansour's request to transfer to another provider organization within Freedom's network and Freedom began sending correspondences to Dr. Mansour's patients informing them that Dr. Mansour would no longer be working with Freedom as of May 31, 2019. Dkt. 23 at 42–43; Dkt. 23-6 at 1. Dr. Mansour claims that Ms. Gareau's justification for denying a transfer was based on false pretext related to his "HEDIS score." Dkt. 23 at 43. When Dr. Mansour rebutted this false information, Ms. Gareau's supervisor allegedly "became aggressive and agitated" and "refused to give any reason for the denial of the transfer." *Id.* at 44. In some of the same correspondences sent to Dr. Mansour's patients concerning Dr. Mansour's departure from Freedom, Freedom indicated that the patients were being reassigned to a physician employed by Florida Medical Associates, LLC (d/b/a "VIPcare")—another entity allegedly owned by Mr. Pagidipati. *Id.* Plaintiffs ultimately claim that,

9

as a result of this orchestrated retaliation, Dr. Mansour lost approximately 600 patients, many of whom he had provided care to for over ten years. *Id.* at 45.

## V.     The Parties' Litigation History

On December 3, 2019, Dr. Mansour filed a sealed *qui tam* action against Defendants in the Middle District of Florida based largely upon the factual history alleged above.[1] The government nevertheless declined to intervene, and, on September 9, 2020, Dr. Mansour filed an unsealed amended complaint. *See* Dkt. 38-1. Only months later, Dr. Mansour voluntarily dismissed his entire case.

On March 18, 2022, Plaintiffs filed the instant case, once again under seal. Dkt. 1. When the government declined to intervene concerning Plaintiff's *qui tam* claims, which included new assertions pertaining to kick-backs under the PODS program, Plaintiffs filed their Amended Complaint. Dkt. 23. Therein, they assert three counts: Count I—unlawful retaliation against PPC; Count II—unlawful retaliation against Freedom; and Count III—breach of the implied covenant of good faith against Freedom. *Id.* at 46–50. Defendants now move to dismiss these claims.

## LEGAL STANDARD

A complaint withstands dismissal under Federal Rule of Civil Procedure 12(b)(6) if the alleged facts state a claim for relief that is "plausible on its face."

---

[1] *See United States ex rel. George Mansour, M.D. v. Freedom Health, Inc., et al.*, Case No. 8:19-cv-02977-CEH-JSS.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not require detailed factual allegations but demands more than an unadorned accusation. *Id.* All facts are accepted as true and viewed in the light most favorable to the Plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

At the dismissal stage, a court may consider matters judicially noticed, such as public records, without converting a defendant's motion to one for summary judgment. *See Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 52 (11th Cir. 2006). Additionally, documents may be considered at the dismissal stage if they are central to, referenced in, or attached to the complaint. *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Documents attached to a motion to dismiss may also be considered if the documents are (1) central to the plaintiff's claim, and (2) undisputed (if their authenticity is not challenged). *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## DISCUSSION

The Court begins by considering Defendants' averment that Plaintiffs' Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5). Dkt. 36 at 8; Dkt. 37 at 9. Defendants essentially argue that Plaintiffs abused the FCA's under-seal filing procedures by improperly bundling individual claims with *qui tam* claims, resulting in an intentional failure to provide

timely service. Dkt. 36 at 10; Dkt. 37 at 10. Defendants maintain that this failure justifies dismissal regardless of whether Plaintiffs' individual claims would now be time-barred. Dkt. 36 at 11–12; Dkt. 37 at 10–11.

This argument is unavailing. While Federal Rule of Civil Procedure 4(m) provides that service upon a defendant is due within 90 days of filing a complaint, 31 U.S.C. § 3730(b) provides that *qui tam* claims brought under section 3729 of the FCA shall be filed under seal and "not be served on the defendant[s] until the court orders." It follows that, "[i]n a *qui tam* action, the Rule 4(m) service window [generally] begins with the unsealing of the complaint." *United States ex rel. Clarke v. Healthsouth Corp.*, No. 8:14-CV-778-T-33TGW, 2019 WL 11502531, at *1 (M.D. Fla. May 24, 2019) (internal quotations and citations omitted). There is no dispute here that Plaintiffs served Defendants within this window. Plaintiffs' service was therefore timely.

Defendants respond that, because Plaintiffs' FCA retaliation claims fall under 31 U.S.C. § 3730(h), section 3730(b)'s "relaxed procedural provisions do not apply[.]" Dkt. 36 at 9; *see also* Dkt. 37 at 10. The Court disagrees. Multiple courts have found that service of a complaint containing interrelated *qui tam* and FCA retaliation claims is due 90 days from the date upon which the complaint is unsealed. *See United States ex rel. Gallo v. Thor Guard, Inc.*, No. 3:18-CV-811-J-32MCR, 2020 WL 1248975, at *4 n.8 (M.D. Fla. Mar. 16, 2020) (finding that service for a

complaint containing both *qui tam* and individual claims was due 90 days after the complaint was unsealed); *United States v. Oakland Physicians Med. Ctr., LLC*, 44 F.4th 565, 567–68 (6th Cir. 2022) (same), *cert. denied sub nom. United States & Michigan, ex rel. Mohamad Sy v. Oakland Physicians Med. Ctr., LLC*, 143 S. Ct. 782, 215 L. Ed. 2d 51 (2023); *Mikovits v. Whittemore Peterson Inst.*, No. 3:15-CV-00409-RCJ-WGC, 2020 WL 1000519, at *2–3 (D. Nev. Mar. 2, 2020) (same). This Court finds the same.[2] Accordingly, because Plaintiffs' retaliation, implied covenant, and *qui tam* claims largely arise from the same common nucleus of facts, they were properly brought together, and Plaintiffs' individual claims were properly served within 90 days of the Court's order to unseal the original Complaint.

Finally, the Court notes that, even "[a]bsent a showing of good cause, [district courts] ha[ve] discretion to extend the time for service of process." *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d 1277, 1282 (11th Cir. 2007). And the Eleventh Circuit has expressly recognized that exercising this discretion "may be justified . . . if the applicable statute of limitations would bar the refiled action." *Id.* (cleaned up) (citations omitted). Here, the applicable statute of limitations would bar Plaintiffs

---

[2] Defendants' reliance on *United States v. Millennium Physician Grp., LLC*, No. 2:16-CV-726-JLB-KCD, 2023 WL 2022232 (M.D. Fla. Feb. 15, 2023) does not change the Court's opinion. There, "the allegations underpinning [the plaintiff's] employment and contract claims [did] not concern involve, or implicate the allegations [supporting] his FCA claims." *Id.* at *6. The opposite is true here. Further, in *Millennium*, the plaintiff did not even provide service within the 90 day window allotted by Rule 4(m) following the unsealing of the complaint. *Id.* at *7. *Millennium* is inapposite.

13

from refiling their action. As a result, the Court will not functionally dismiss Plaintiffs claims with prejudice on procedural grounds—especially where Defendants have failed to show that their ability to defend Plaintiffs' individual claims have been materially diminished.

This brings the Court to the merits of Plaintiffs' FCA retaliation claims (Counts I and II). "In order to state a claim for FCA retaliation, a plaintiff must establish three elements: (1) he is a protected person, (2) he was engaged in protected conduct, and (3) his employer retaliated against him because of his protected conduct." *Arthurs v. Glob. TPA LLC*, 208 F. Supp. 3d 1260, 1264 (M.D. Fla. 2015) (citing *Mack v. Augusta–Richmond Cnty., Ga.*, 148 Fed. Appx. 894, 896–97 (11th Cir. 2005) (per curiam)). Defendants argue that Plaintiffs fail to establish that Dr. Mansour was engaged in a protected activity and that he was retaliated against for engaging in that activity. Dkt. 36 at 13–22; Dkt. 37 at 13–20.

In order to establish that Plaintiffs were engaged in a protected activity, Plaintiffs must plead sufficient facts to raise a reasonable inference that Dr. Mansour: (1) made efforts to stop one or more FCA violation; or (2) engaged in lawful acts in furtherance of and FCA lawsuit. 31 U.S.C. § 3730(h)(1); *see also Lord v. Univ. of Miami*, 571 F. Supp. 3d 1299, 1310 (S.D. Fla. 2021). That said, "an act constitutes protected activity [only] where it is motivated by an objectively reasonable belief that the employer is violating, or will soon, violate the [FCA]."

14

*Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1288–89 (11th Cir. 2021) (internal quotations and citations omitted). A "sincere belief" is not enough. *Id.*

Plaintiffs have adequately pled that Dr. Mansour made efforts to stop one or more FCA violations and that he was motivated by a reasonable belief that PPC and Freedom had, or would soon, violate the FCA. Accepting Plaintiffs' allegations as true, Dr. Mansour was repeatedly given 5 Star Forms that contained past diagnoses which his patients themselves denied. It was therefore reasonable for Dr. Mansour to believe, after examining said patients, that these were false historical diagnoses that PPC had coded and provided to Freedom, who had then submitted them to CMS. This means, at the very least, that Dr. Mansour had a reasonable belief that PPC and Freedom had violated the FCA. Further, Dr. Mansour clearly made efforts to stop violations of the same variety. He purportedly attempted to correct false diagnoses reflected on 5 Star Forms on no less than twelve occasions. He also resisted PPC's pressure to revise his clinical notes after the fact. This being the case, the Court will not further discuss this FCA retaliation element in relation to the PODS and medivan programs. Whether Dr. Mansour had a reasonable belief that PPC and Freedom were violating the FCA and whether he attempted to stop them are established by the plausible allegations Plaintiffs set forth.

The next issue to consider is whether Plaintiffs have adequately alleged that PPC and Freedom retaliated against Dr. Mansour for his protected conduct. "To

establish the necessary causal connection under § 3730(h)(1), the plaintiff must show that the employer was at least aware of the protected activity," *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015), and that the employer took adverse employment action "because of" the protected activity, §3730(h)(1). At the motion to dismiss stage, "the showing necessary to demonstrate the causal-link part of the prima facie case of retaliation is not onerous; the plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *United States ex rel. Rehfeldt v. Compassionate Care Hospice Grp., Inc.*, No. 5:19-CV-00304-TES, 2021 WL 2229057, at *5 (M.D. Ga. June 2, 2021) (cleaned up) (internal quotations and citations omitted).

Plaintiffs have met this burden. With regard to PPC, who terminated the Agreement, Plaintiffs have plausibly alleged that Dr. Mansour's constant arguments with Mr. Roy and Mr. Patel gave rise to PPC's awareness that Dr. Mansour was attempting to stop false diagnoses which would result in FCA violations. This reasonable inference is directly supported by Plaintiffs' allegations concerning Mr. Roy's recourse to speaking with PPC supervisors and circumstantially supported by the totality of circumstances (most notably timing) that led Dr. Mansour to lose all of his patients, many of whom were allegedly reassigned to another provider controlled by PPC's owner. Plaintiffs have plausibly alleged that Dr. Mansour's protected activities and PPC's negative employment action were related.

16

The same is true with regard to Freedom, who allegedly failed to reassign Dr. Mansour under the Addendum due to a desire to stop him from interfering with improper risk-adjustment score inflation.[3] To begin with, although Freedom's knowledge of Dr. Mansour's protected activity is a closer question than PPC's, Plaintiffs have alleged that Freedom had direct knowledge of Dr. Mansour's issues with the 5 Star Forms, as a Freedom representative conducted an in-person audit of his records and "explicitly instructed Dr. Mansour to remove any 5 Star Forms from his patient charts or records because they were 'steering tools.'" Dkt. 23 at 20. More importantly, however, Plaintiffs have provided a number of factual allegations that plausibly suggest that Freedom and PPC were working in tandem. Indeed, beyond Mr. Pagidipati's former role at Freedom, the timing of PPC's termination likely meant that Freedom's enrollees would not have the opportunity to switch MAOs. And this is not to mention that Freedom allegedly refused to transfer Dr. Mansour based on a purportedly false pretext while assigning his patients to another provider controlled by Mr. Pagidipati. The circumstantial evidence forwarded by Plaintiffs gives rise to the inference that Freedom knew that Dr. Mansour was a problem and

---

[3] The Court is unpersuaded by Freedom's argument that it took no adverse employment action against Dr. Mansour because their transfer refusal post-dated PPC's termination of the Agreement. Dkt. 37 at 15–17. It is not clear at this stage that termination of the Agreement ended all contractual privity between Freedom and Dr. Mansour. The Addendum, signed by Plaintiffs, Freedom, and PPC was arguably still in effect.

17

that they acted to stop him in concert with PPC. Plaintiffs have therefore plausibly alleged FCA retaliation claims against Defendants.

The final issue to consider is Plaintiffs' implied covenant claim against Freedom (Count III). "[T]he implied covenant of good faith and fair dealing is a part of every contract under Florida law." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001). Further, "[w]ith the implied covenant, one party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Id.* Here, Plaintiffs have plausibly alleged that Freedom exercised its discretion under the Addendum's termination provision so as to retaliate against Dr. Mansour for failing to cooperate with Freedom and PPC's alleged scheme to artificially inflate risk-adjustment scores. Plaintiffs further allege that this bad faith was at odds with Dr. Mansour's reasonable expectations under the Addendum as a physician treating Freedom enrollees for over twenty years. Such an abuse of discretion, if proven, may constitute a breach of the implied covenant of good faith. The Court consequently declines to dismiss Count III.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Defendants' motions to dismiss (Dkt. 36; Dkt. 37) are **DENIED.**

**DONE AND ORDERED** at Tampa, Florida, on October 25, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record